## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-35-1 (RC)** |
| **CASEY TRYON-CASTRO,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Casey Tryon-Castro to 80 months' incarceration – near the middle of the Guidelines range of 70 to 87 months – 3 years' supervised release, $2,000 in restitution, and a $485 special assessment.

### I.        INTRODUCTION

The defendant, Casey Tryon-Castro, violently and persistently participated in the January 6, 2021 attack by a mob of hundreds of rioters on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Tryon-Castro, a mother of seven and a former member of the United States Army, traveled to Washington D.C. on January 5, 2021 with her brother and her brother's friend. She attended the Stop the Steal rally on the morning of January 6th and then marched with others to the U.S. Capitol. Tryon-Castro was among the very first rioters to cross onto the closed grounds of the U.S. Capitol, passing fencing, signs, and barricades.

She arrived on the West Plaza early and watched for over an hour as rioters attacked police officers. She herself screamed and yelled at the police during this time, calling them, among other things, "fucking traitors!" When the police were forced to retreat up to the Lower West Terrace, Tryon-Castro quickly followed. As she ascended onto the Inaugural Stage, she bent to pick up a discarded flagpole, then walked to the overlook and held the flagpole over her head in a celebratory gesture to the crowd below.

From there Tryon-Castro proceeded quickly into the Lower West Terrace tunnel (the "Tunnel"), the scene of some of the most violent and protracted attacks by rioters against police on January 6. She spent approximately 35 minutes inside the tunnel. During that time she: (1) encouraged other rioters to fight the police; (2) was sprayed multiple times with OC spray; (3) ripped a police riot shield out of the hands of a police officer; (4) witnessed the brutal assault of MPD Officer Daniel Hodges; and (5) pushed her body against police officers.

Tryon-Castro testified at her jury trial and made several false statements under oath

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

including that she did not push against any officers in the Tunnel and that she didn't know she was yanking a riot shield away from a police officer. Tryon-Castro was also arrested again mere weeks after her convictions in this case on similar charges, namely trespassing and assaulting police officers.

For all of these reasons, as set out in greater detail below, the government recommends that the Court sentence Tryon-Castro to 80 months of incarceration. An 80-month sentence reflects the gravity of Tryon-Castro's persistent and violent conduct inside the tunnel, appropriately punishes her for misrepresentations to the jury under oath, provides specific deterrence, and promotes respect for the law, especially in light of her new criminal charges since these convictions.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF No. 22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The majority of Tryon-Castro's offenses occurred inside the Tunnel. The government, therefore, refers the Court to Trial Exhibit 004, which is a video compilation of the timeline of events at the tunnel.

### B.    Tryon-Castro's Role in the January 6, 2021 Attack on the Capitol

Tryon Castro joined the large crowd marching from the Ellipse to the U.S. Capitol on January 6th. Tryon-Castro, wearing dark clothes and a pink and white wool hat with an orange

stripe, was among the first rioters to arrive at the U.S. Capitol. She crossed onto the closed West

Lawn and climbed over fencing and the stone ledge onto the West Plaza of the U.S. Capitol.



*Image 1: Still image from Trial Exhibit 333, open-source video, at timestamp 2:10 showing Tryon-Castro, circled in red, climbing over fencing and the stone ledge onto the West Plaza*

Tryon-Castro then positioned herself near the police line on the West Plaza for close to ninety minutes. During that time, she:

- Watched as other rioters pulled the bike racks away from police officers and yelled at the police calling them, among other things, "fucking traitors!" (Trial Exhibit 319 at timestamp 1:07);

- Watched and smiled as other rioters pulled down a lamppost on the West Plaza (Trial Exhibit 313 at timestamp 00:25; Trial Exhibit 211 at timestamp 42:30);

- Forcefully responded, "NO!" when another rioter told her to move back from the police line (Trial Exhibit 211 at timestamp 43:11);

- Stood by as her co-travelers grabbed bike racks from police (Trial Exhibit 211 at timestamp 41:30);

- Pushed a large Trump sign with a metal frame and large, heavy metal casters over her head toward the police line (Trial Exhibit 211 at timestamp 11:50; Trial Exhibit 323 at timestamp 1:00); and

- Was repeatedly hit with OC spray fired by police officers against the rioters on the West Plaza (Trial Exhibit 205 at timestamp 1:00; Trial Exhibit 319 at timestamp 1:30; Trial Exhibit 323 at timestamp 3:00).

At approximately 2:30 p.m., the rioters on the West Plaza overwhelmed the police and forced them to retreat closer to the building. A number of officers retreated up onto the Inaugural Stage. Tryon-Castro followed quickly behind, making her way up onto the stage. After arriving on the stage, she bent down to pick up a discarded flagpole on the ground, walked triumphantly to the overlook and held the flagpole up over her head in a celebratory gesture to the rioters on the West Plaza below her.



*Image 2: Zoomed-in still image from Trial Exhibit 101 at timestamp 2:14 showing Tryon-Castro on the Inaugural Stage holding a pole overhead in celebration*

From there, Tryon-Castro walked quickly to the entrance to the Tunnel, and entered at approximately 2:43 p.m. *See* Trial Exhibit 103 at timestamp 2:43:35 p.m. She entered with the flagpole and as she moved further into the tunnel, she banged the flagpole repeatedly against the ground. *Id.* Approximately two minutes later, the crowd in the tunnel began to surge back out of the tunnel and Tryon-Castro left with them. *Id.* at timestamp 2:45:26.

Tryon-Castro returned to the tunnel for a second time less than one minute later at 2:46 p.m. *Id.* at timestamp 2:46:36 p.m. By approximately 2:56 p.m., she had reached the police line in the Tunnel. At about this time, the crowd in the Tunnel surged forward and pressed hard against the police. Tryon-Castro, who was at the front of the crowd, was pressed firmly up against officers

and called out for help. *See* Trial Exhibit 308 at timestamp 5:50. Metropolitan Police Department

(MPD) Sergeant Bogner attempted to help Tryon-Castro, telling the crowd to back up because

other rioters were crushing her. *Id.* Seconds later, Tryon-Castro was able to back away from the

police. *Id.* She didn't leave the tunnel, however.

Instead, Tryon-Castro moved towards the Tunnel's entrance. From there, she yelled out

encouragement and instructions to other rioters. For example, Tryon-Castro screamed, "Take our

fucking country back! Push!" Trial Exhibit 320 at timestamp 00:28. Several seconds later, she

yelled out "Push! Push! Push!" *Id.* at timestamp 2:05. Then she instructed, "Don't let them take

the doors!" and "Open the doors!" referring to the double doors in the Tunnel that police officers

were trying to shut to create a barrier between them and the rioters. *Id.* at timestamp 2:52. After

the officers successfully pulled one of the doors shut, Tryon-Castro called out to other rioters "open

that door! Open that door!" *Id.* at timestamp 3:10.

Tryon-Castro then pushed her way closer to the police line, again calling out to other

rioters, "Push! Push! Push!" *Id.* at timestamp 3:50. Consistent with her previous encouragement

to other rioters, she then moved next to the closed door that separated the Tunnel from the interior

of the Capitol building and, with the help of co-defendant Micaiah Joseph and other rioters[2],

pushed the door open.

---

[2] One of the other rioters who helped to open the door was James Weeks, the brother of Tryon-Castro's co-defendant, Troy Weeks. On June 7, 2024, James Weeks plead guilty before Judge Howell to a single violation of 18 U.S.C. § 111(a). D.D.C. Crim. No. 24-CR-131 (BAH). On October 4, 2024, Judge Howell sentenced James Weeks to 27 months' imprisonment. Judge Howell found that James Weeks' actions in opening the door in this instance were particularly aggravating and supported his sentence within the applicable Guidelines range.



*Image 3: Still image from Trial Exhibit 308 at timestamp 12:13 showing Tryon-Castro as she began to pull the door open*

After the rioters had forced the door open, Tryon-Castro immediately moved around it and began to push against the backs of other rioters who were pushing against the police. A rioter behind her sprayed a can of bear mace over her head and at the police.



*Image 4: Still image from Trial Exhibit 306 at timestamp 00:54 showing Tryon Castro (with her hat off) pushing with other rioters as a rioter behind her deploys bear spray at police*

Several seconds later, rioters in the tunnel called out to "take their goddamn shields!" Trial Exhibit 308 at timestamp 13:53. Tryon-Castro responded, "Okay!" and then grabbed a police riot shield then held by MPD Sergeant Phuson Nguyen.



*Image 5: Still image from Trial Exhibit 308 at timestamp 14:00 showing Tryon-Castro pulling a police riot shield out of MPD Sergeant Nguyen's hands*

Tryon-Castro held onto the shield for at least 13 seconds. *See* Trial Exhibit 308 from timestamp 13:54 to 14:07. The police officers attempted to keep control of the shield but Tryon-Castro and other rioters[3] ultimately successfully pulled the shield away from them.

---

[3] Christopher Quaglin was the other rioter (in the American flag print shirt) who helped Tryon-Castro pull the riot shield from Sergeant Nguyen. Following a bench trial based on stipulated facts, Judge McFadden convicted Quaglin of, inter alia, robbery, in violation of §18 U.S.C. § 2111 and assault on a police officer, in violation of 18 U.S.C. § 111(a)(1). D.D.C. Crim. No. 21-CR-41 (TNM). On May 5, 2024, Judge McFadden sentenced Quaglin to 144 months' incarceration for these and other convictions.



*Image 6: Still image from Trial Exhibit 320 at timestamp 6:24 showing Tryon-Castro (circled) pulling the riot shield (indicated with an arrow) away from officers and getting sprayed with OC spray*

After securing the shield, Tryon-Castro and other rioters passed the shield back towards the Tunnel entrance to other rioters behind them in the crowd. *See* Trial Exhibit 320 at timestamp 6:25.

Several seconds later, Tryon-Castro again approached the police line inside the Tunnel. At this time – 3:06 p.m. – there was a lull in the fighting and space had been created between the police and the rioters in the tunnel. A rioter[4] was lying on the ground near the now opened double

---

[4] This rioter is Paul Belosic. He has been charged with, among other things, violations of 18 U.S.C.

doors inside the tunnel. Tryon-Castro approached the police and claimed to want to help the rioter on the ground. The rioter responded to her attempts with, "No, thank you!" Trial Exhibit 213 at timestamp 4:51.

Shortly thereafter, rioters in the tunnel again began to organize and renew their attacks on police. They called out to "make a shield wall!" Trial Exhibit 308 at timestamp 15:50. Tryon-Castro was at the police line as the rioters began to pass up stolen riot shields – like the one she stole a few minutes earlier from Sergeant Nguyen. As shields began to appear near her, Tryon-Castro told other rioters, "We gotta get the shields in front, ya'll! Get the shields in front!" *Id.* at timestamp 16:25. Immediately after this, rioters in the tunnel begin to chant, "SHIELD WALL! SHIELD WALL! SHIELD WALL!" *Id.* at timestamp 16:30. Then another rioter was trying to move away from the police line back toward the archway and Tryon-Castro again instructed other rioters to "Let him out!" and "Make a hole!" *Id.* at timestamp 16:39. Tryon-Castro then moved directly in front of the police and began to push.

---

§§ 371 (conspiracy), 1512(c) (obstruction of Congress), 231 (civil disorder), and 641 (theft of government property) in D.D.C. Crim. No. 21-CR-246 (ABJ). Belosic is a fugitive from justice and has not yet been located by authorities.



*Image 6: Still image from Trial Exhibit 308 at timestamp 16:48 showing Tryon-Castro pushing against officers, including USCP Sergeant Aquilino Gonell[5]*

Tryon-Castro continued to push against officers in this location for at least two and a half minutes. *Id*. In fact, she called out twice to other rioters, "I'm okay! I'm okay! I'm pushing!" *Id*. at timestamps 17:45 and 18:38. Ultimately, Tryon-Castro managed to move around the door frame and wedge herself into the space between the door and the side of the tunnel – emulating the position of the rioter on the floor that she previously tried to move. *Id.* at timestamp 19:03. From this location, Tryon-Castro peered through the glass in the doorframe and watched as a rioter[6]

---

[5] The government anticipates that Sergeant Gonell will attend and speak at Tryon-Castro's sentencing hearing.

[6] This rioter is Steven Cappuccio. Following a bench trial on July 20, 2023, Judge McFadden convicted Cappuccio of violating 18 U.S.C. §§ 111(a)(1) and (b) and other offenses. D.D.C. Crim. No. 21-CR-41 (TNM). On November 23, 2023, Judge McFadden sentenced Cappuccio to 85 months' incarceration.

viciously attacked MPD Officer Daniel Hodges by slamming his gas mask against his face repeatedly, pulling it off his head and then striking him in the head with his own baton. *Id.* at 20:23.



*Image 7: Still image from Trial Exhibit 308 at timestamp 20:27 showing Tryon-Castro watching as another rioter grabbed MPD Officer Daniel Hodges' gas mask*

But even watching this horrific violence did not cause Tryon-Castro to leave the tunnel. Instead, she remained in that enclave for more than three more minutes. *Id.* at timestamp 23:47. At that time there was another lull in the violence and there was space between the police and the rioters. But less than a minute later, the rioters were again pressing up against the police in the tunnel. Tryon-Castro was at the police line again, as well, thrusting her body against rioters in front of her who were fighting and pushing up against the police.

14



*Image 8: Still image from Trial Exhibit 308 at timestamp 24:32 showing Tryon-Castro (circled) pushing up against other rioters who were pushing against the police*

At approximately 3:18 p.m., the police inside the tunnel gained momentum and pushed all of the rioters, including Tryon-Castro, out through the archway and onto the Inaugural Stage. *See* Trial Exhibit 104 at timestamp 3:18:36 p.m. As Tryon-Castro was pushed out of the tunnel, her eyes were clamped shut OC spray yet again.

15



*Image 9: Still image from Trial Exhibit 310 at timestamp 00:29 showing Tryon-Castro being pushed out of the tunnel with her eyes shut*

As Tryon-Castro was pushed out, other rioters just a few yards behind her dragged MPD Officer Michael Fanone and USCP Officer Morris Moore into the crowd and assaulted them. *Id.*

### C. Tryon-Castro's Interview with FBI

On January 25, 2021, Tryon-Castro was interviewed by the FBI at her home in Roanoke, Virginia. During the interview, she told FBI agents that she traveled to Washington, D.C. to show support for President Trump and to attend his speech at the White House on January 6, 2021. Tryon-Castro admitted that she was inside the Lower West Terrace tunnel, which she referred to as a "hallway" attached to the Capitol building. She admitted she should not have been there. Initially, she said she traveled to Washington D.C. alone. When confronted with a photograph of herself and her brother at the Capitol, she then admitted that she traveled to Washington D.C. with

her brother and his two friends. Tryon-Castro told the FBI that all four of them drove together to Washington, D.C. in her car. She said that on January 6, 2021, she and her three companions then met approximately 10 other individuals from an activist group.

Tryon-Castro told the agents she went to the Capitol building because she felt like her voice wasn't being heard by Congress. She stated that the mood of the crowd changed when someone yelled out that VP Pence didn't do what he was supposed to do. Tryon-Castro reported seeing rioters carrying zip ties on the way to the U.S. Capitol Building and saying words to the effect of, "we are going to arrest them for treason." When agents played her a video of someone yelling "push! Push! Push!" in the tunnel, she admitted that it was her voice. Tryon-Castro also described the assault she witnessed on MPD Officer Hodges.

**D.  Tryon-Castro's Trial Testimony**

Tyron-Castro testified on her own behalf at the jury trial in this case. Contradicting some of her statements during her interview with the FBI, she testified that she traveled to Washington, D.C. alone because a friend in the area had passed away. June 5, 2024 Trial Transcript at 208:1-8. She claimed that she only met up with her brother and went to the rally on January 6th at the last minute. *Id.* at 208:25 to 209:7.

During her testimony she also made several claims that were contradicted by the evidence presented at trial, including:

- **She didn't push against officers on January 6, 2021.** *See* June 6, 2024 Trial Transcript at 80:6-7. Video evidence from the tunnel shows that she shoved her body against officers for at least three minutes inside the Tunnel, even calling out twice "I'm okay, I'm okay. I'm pushing!" Trial Exhibit 308 at timestamps 17:45 and 18:38.

- **She did not know that the shield she grabbed was being held by a police officer.** *See* June 6, 2024 Trial Transcript at 11:14-18. First, the shield had a black law enforcement insignia on the middle of it. Second, when a rioter in the tunnel said, "Take their goddamn shields!" she responded by saying, "okay" and then grabbed the shield. Trial Exhibit 308 at timestamp 13:53. By this time, she had been inside the Tunnel for approximately 12 minutes and had seen other rioters using police riot shields against the police. Finally, the video evidence showed that Tryon-Castro pulled on the shield for at least 13 seconds before she succeeded in pulling it away from Sgt. Nguyen. Trial Exhibit 308 from timestamp 13:54 to 14:07. She knew that the shield was police equipment and that a police officer was holding onto it when she pulled it away from him.

### E. Tryon-Castro's Arrests Following her Convictions

The jury convicted Tryon-Castro of all charges in the indictment against her following a trial on June 10, 2024. Approximately five weeks later, on August 17, 2024, Tryon-Castro was arrested in Roanoke, Virginia and charged with public intoxication and two counts of assault on law enforcement officers. According to Roanoke Police Department reports, officers responded to Dr. Pepper Park on August 17, 2024 after receiving a report of trespassing. Upon arrival, officers were advised that Tryon-Castro had snuck into a concert and refused to leave. When officers approached Tryon-Castro, they noticed she was "unsteady on her feet" and had the odor of alcohol on her breath. Officers asked her name several times and Tryon-Castro eventually yelled back "none of your fucking business." An officer then attempted to detain her, but she resisted and attempted to run away. Officers restrained her and placed her under arrest. She was then transported to the Roanoke City Jail. According to the criminal complaint filed in the General District Court for Roanoke City, after Tryon-Castro arrived at the jail, correctional officers attempted to change Tryon-Castro's clothes. Tryon-Castro then became assaultive and attempted to bite one of the deputies on the leg. Tryon-Castro then aggressively kicked another officer multiple times on her right knee, shoulder, and chin.

18

## III.    THE CHARGES AND TRIAL

On September 6, 2023, a federal grand jury returned a superseding indictment charging Casey Tryon-Castro with eight counts, including, civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); assaulting, resisting, or impeding Sergeant Nguyen., in violation of 18 U.S.C. § 111(a)(1) (Count Four); robbery, in violation of 18 U.S.C. § 2111 (Count Five) for stealing Sgt. Nguyen's riot shield; assaulting, resisting or impeding certain officers and aiding and abetting, in violation of 18 U.S.C. § 111(a)(1) (Count Seven); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Ten); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Twelve); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Fourteen); and impeding passage through the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Sixteen). On June 10, 2024, the jury convicted Tryon-Castro of those offenses following a jury trial.

## IV.    STATUTORY PENALTIES

Tryon-Castro now faces sentencing on each of the above eight convictions.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following maximum penalties on each conviction:

| | |
|---|---|
| Count One – civil disorder | 5 years' imprisonment |
| | 3 years' supervised release |
| | $250,0000 fine |
| | $100 special assessment |
| | |
| Counts Four and Seven – assaulting, resisting or impeding officers | 8 years' imprisonment |
| | 3 years' supervised release |

|                                                                          | $250,000 fine<br>$100 special assessment |
|--------------------------------------------------------------------------|------------------------------------------|
| Count Five - robbery                                                     | 15 years' imprisonment<br>3 years' supervised release<br>$250,000 fine<br>$100 special assessment |
| Counts Ten, Twelve and Fourteen – certain acts on restricted buildings or grounds | 1 year's imprisonment<br>3 years' supervised release<br>$100,000 fine<br>$25 special assessment |
| Count Sixteen – impeding passage through Capitol grounds                 | 6 months' imprisonment<br>$5,000 fine<br>$10 special assessment |

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set out in the PSR. Specifically, the total offense level is 27, which when combined with a criminal history category of I, results in a Guidelines range of 70 to 87 months.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because the defendant used violence or credible threats of violence against people or property during the offense.

20

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Tryon-Castro's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Tryon-Castro ignored clear signs that the grounds of the U.S. Capitol were closed, she watched for over 90 minutes as the riot evolved on the West Plaza, and then she entered the Lower West Terrace tunnel, the location of the longest and most violent attacks against the police that day. While in the tunnel, she vociferously encouraged other rioters to take action against the police, she pushed against the police herself, she robbed a police officer of his protective shield, and she watched as another rioter viciously attacked Officer Hodges. The nature and circumstances of Tryon-Castro's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 80 months' incarceration.

### B.  The History and Characteristics of the Defendant

Tryon-Castro is 35 years old, she was 32 years old on January 6, 2021. PSR at ¶¶ 120. She reported a difficult childhood and early adulthood which involved experiencing and witnessing abuse. *Id.* at ¶¶ 125-128, 133. Her current partner, Ethan Mauck, is currently facing his own criminal charges arising from his actions at the riot on January 6, 2021. *Id.* at ¶ 135. Mr. Mauck has three children from a previous relationship and Tryon-Castro has three children from a

previous relationship; the couple has one child together for a total of seven children. *Id.* at ¶¶ 133, 135.

Tryon-Castro claimed to only consume alcohol at "social gatherings" (PSR at ¶ 153) but the PSR notes a number of alcohol related convictions and arrests. *See* PSR at ¶¶ 103 (conviction for driving while intoxicated), 115 (arrest for public swearing or intoxication), 116 (recent arrest for public intoxication). Tryon-Castro has one prior criminal conviction for driving while intoxicated in January 2020. *Id.* at ¶ 103. She was found guilty and sentenced to 30 days' custody (which was suspended) and to pay a $250 fine. *Id.*

As noted above, Tryon-Castro was recently arrested following her convictions in this case and is currently facing charges of public intoxication and two counts of assault on law enforcement officials. *Id.* at ¶¶ 116-117. Thus, Tryon-Castro's criminal history is an aggravating factor in this case. Most concerningly, Tryon-Castro does not appear to have been at all deterred by her criminal convictions and conditions of release in this case from engaging in similar criminal behavior. Mere weeks after her conviction by the jury in this case, Tryon-Castro is again alleged to have trespassed onto private property and again alleged to have violently resisted the police when they attempted to enforce the laws. While these charges are only accusations at this point, the facts underlying these arrests strongly suggest that Tyron-Castro is at a high risk of recidivism and a sentence within the Guidelines range will provide the specific deterrence necessary to protect the community from further crimes by her.

Tryon-Castro is currently unemployed. *Id.* at ¶¶ 162-163. At the time of her arrest, she was employed by Member One Bank selling mortgages. *Id.* at ¶ 164. As of January 6th, she was working

for Wells Fargo as an Executive Office Case Specialist investigating instances of fraud at the bank. *Id.* at ¶ 165; June 5, 2024 Trial Transcript 221:9-11. Tryon-Castro's employment and service history are also aggravating factors in this case. Tryon-Castro had a good job on January 6, 2021 and several children to care for. Her crimes were not motivated by poverty or addiction. She had several choices on January 6th other than to commit these crimes. What's more, her job was to investigate crime against her employer. She played a role (albeit in the private sector) in enforcing the law but that didn't stop her from breaking it on January 6th.

Tryon-Castro also served in the U.S. Army from 2007 to 2013. *Id.* at ¶ 166. Her military service is also aggravating for similar reasons. Typically, a defendant's service on behalf of her country would be a mitigating factor for the courts at sentencing. But Tryon-Castro turned her miliary service on its head when she violently attacked the very country she swore to protect. Even worse, she attacked multiple police officers. As a former service member, Tryon-Castro certainly knew the situation that she was placing these officers in when she relentlessly attacked them in the narrow confines of the Lower West Terrace Tunnel. But that didn't stop her. The Court should similarly reject any claim that the potential loss of her pension because of her convictions supports a lower sentence here. Tryon-Castro should have known that commission of a crime would jeopardize her pension but that did not stop her on January 6th. As she testified, it was more important to her to "take a stand." The Court should not now give her a lesser sentence when her actions resulted in obvious consequences.

For all of these reasons, Tryon-Castro's history and characteristics support a sentence of 80 months' incarceration, at the high end of the Guidelines range.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Tyron-Castro's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As already discussed above, there are numerous factors present in this case that support a strong need for specific deterrence. Tryon-Castro encountered fencing and "AREA CLOSED" signs on January 6 before she even crossed

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

onto Capitol grounds. But those signs didn't stop her. She encountered police officers, was sprayed with OC spray, and witnessed numerous instances of violence against the police on the West Plaza. But none of that stopped her. She was inside the Lower West Terrace tunnel, pushing against police, getting sprayed with OC spray, encouraging other rioters to fight the police, and stealing police equipment for over 25 minutes, but even that didn't stop her. She only left when she was sprayed with OC spray and pushed out by the police. Last, her actions since her convictions – violations of her pretrial release conditions and new arrests that charge her with trespassing and violence against the police – also show a need for specific deterrence here. A sentence of 80 months' incarceration will provide the strong specific deterrence that Tryon-Castro clearly requires to keep her from continuing to violate the law.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Although Tryon-Castro was charged together with four co-defendants, her conduct, and her charges of conviction, are far more serious than those of her two co-defendants who have been sentenced so far in this case. Instead, better comparators are cases, cited below, where similarly-situated defendants engaged in similarly violent conduct.

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Kyle Fitzsimons*, 21-CR-158 (RC). Fitzsimons came to the U.S. Capitol wearing a butcher costume on January 6 and carrying a bow and arrow. Unlike Tryon-Castro, he was inside the tunnel for a short amount of time – only about three minutes. But during that time, he committed acts of significant violence. For example, like Tryon-Castro, he attempted to steal protective equipment from MPD Sergeant Nguyen, the same officer from whom Tryon-Castro stole the riot shield. Fitzsimons also grabbed Sergeant Gonell – another victim of Tryon-Castro's – and threw him to the ground, while punching other officers. Like Tryon-Castro, Fitzsimons also encouraged other rioters to fight the police as he left the tunnel. Fitzsimons, like Tryon-Castro, was convicted of multiple assaults of police officers following a trial, though Fitzsimons was also convicted of multiple assaults with a deadly weapon, which Tryon-Castro was not. Fitzsimons also made several statements on social media or to the media claiming he was innocent and spreading disinformation. Tryon-Castro did not engage in the same public disinformation campaign, but she did provide false testimony, under oath, at her jury trial. Moreover, Fitzsimons was not a former service member and was not charged with new similar crimes after his conviction. This Court sentenced Fitzsimons to 87 months' incarceration. A slightly lower sentence of 80 months for Tryon-Castro is appropriate because she was not convicted of 18 U.S.C. § 111(b) but still reflects the seriousness of her conduct for 25 minutes in the tunnel and the need for specific deterrence in her case.

*United States v. Jeffrey Sabol, et al.*, 21-CR-35 (RC). In this case, the Court sentenced eight defendants who all committed assaults at approximately 4:27 p.m. at the Lower West Terrace

tunnel on January 6th. Six of the eight defendants[10] were convicted of single violations of 18 U.S.C § 111(a)(1) and (b) pursuant to plea agreements with the government. Each of these defendants contributed to a group assault on two police officers who were dragged out of the tunnel and into the crowd. Their conduct, on average, spanned a total of three minutes – much shorter than Tyron-Castro's time in the tunnel – but was arguably much more violent than either of Tryon-Castro's assaults. The Court sentenced these defendants to a range of 30 months' incarceration (defendant Mullins) to 57 months' incarceration (defendant Whitton). These defendants earned significantly lower sentences than Tryon-Castro because their conduct, while more violent, was more limited; they each had only a single conviction which resulted from a plea, not a trial; they all accepted responsibility and did not provide false testimony; none of them had new arrests on pretrial release; and none of them was a former member of the armed services.

One of the eight defendants (Sabol) was convicted of obstruction of Congress, robbery, and assault with a deadly weapon following a stipulated trial. The Court sentenced him to 63 months' incarceration. Unlike Tryon-Castro, Sabol came to the U.S. Capitol with weapons, including a buck knife and zip ties. But similarly to Tryon-Castro, Sabol was convicted of robbery for ripping a police baton out of an officer's hands near the Tunnel. Tryon-Castro should receive a higher sentence than Sabol because she spent more time fighting the police in the tunnel, she took on a leadership role in the fight by encouraging and directing other rioters, she was arrested

_____

[10] The six defendants who pleaded guilty to a violation of 18 U.S.C. § 111(a)(1) and (b) were Justin Jersey, Mason Courson, Logan Barnhart, Clayton Mullins, Jack Whitton, and Peter Stager.

for new offenses while on release, and she is a former member of the armed forces who knew the danger she caused to the overpowered police officers attempting to protect the Capitol.

The last of the eight defendants to be sentenced by this Court was Ronald McAbee. McAbee, is a former member of law enforcement. In fact, he wore his "Sheriff" ballistic vest to the U.S. Capitol on January 6th. He dragged an officer into the crowd, pinned that officer to the ground and physically fought other officers who tried to help that officer. These acts were undoubtedly more violent than Tryon-Castro's acts in the tunnel but McAbee was only at the tunnel for a few minutes, not the twenty-five minutes Tryon-Castro fought the police inside the tunnel. McAbee entered a blind plea to violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3) but was convicted by a jury of a violation of 18 U.S.C. § 111(a)(1) and (b) and misdemeanors. The Court sentenced McAbee to 70 months' incarceration. The Court should sentence Tyron-Castro to a higher sentence to account for her longer time inside the tunnel, her robbery of Sergeant Nguyen, her encouragement and direction of other rioters, her false testimony at trial, and her new arrests on pretrial release.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Tryon-Castro was convicted of multiple violations of offenses under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Tryon-Castro to pay $2,000 in restitution for her convictions. This amount fairly reflects Tryon-Castro's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Tryon-Castro convictions subject her to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Tryon-Castro's assets set forth in the PSR suggest that she is unable, and is unlikely to become able, to pay a fine. PSR at ¶ 175.

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 80 months' incarceration, three years of supervised release, $2,000 in restitution and a $485 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney